No. 18,012.

GILBERT MARSHALL, ET AL. *v.* CHECKER CAB
COMPANY, ET AL.

(348 P. [2d] 372)

Decided December 7, 1959.   Rehearing denied February 1, 1960.

Messrs. HORNBEIN & HORNBEIN, Mr. ROY O. GOLDIN, for plaintiffs in error.

Mr. WALTER W. SIMON, Mr. EDWARD J. SCHEUNEMANN, for defendants in error Yellow Cab Company of Colorado, Inc., Yellow Cab, Inc., and Checker Cab, Inc.

Messrs. MUELLER & MUELLER, Mr. ALBERT A. NORBONT, for defendants in error Checker Cab Company and Paul Johnson.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

THE parties appear here in the same order they appeared in the trial court. We refer to plaintiffs in error as plaintiffs, to Checker Cab Company as CHECKER; to Yellow Cab Company of Colorado and Yellow Cab, Inc. (though mentioned in the caption of the complaint as a defendant, there is no Yellow Cab Company of Colorado), as YELLOW; Checker Cab, Inc., a new corporation organized by Yellow to take title to the assets purchased from Checker, as PURCHASER, and to Paul Johnson as Johnson.

The action was commenced December 29, 1950, as a class action, by the three named plaintiffs in behalf of themselves and all others similarly situated (about 500 previous cab owners and drivers of Checker).

Plaintiffs prayed for an injunction to halt a proposed sale and transfer by Checker to Yellow of certain two-way radio equipment, a Federal Communications Commission permit issued in the name of Checker to operate two-way radio, a permit or license issued by Denver to operate a taxi service, good will of Checker, and other assets. In a second claim plaintiffs seek to compel Checker and Johnson to account for all proceeds of a so-called "Drivers' Crash Fund" and "Drivers' Radio

Fund." Hearing was had on the request for a temporary injunction, on completion of which it was ordered that $7,000.00 of the proceeds of the proposed sale be, by Yellow, deposited in the registry of the court; this was done, and the prayer for an injunction was denied. Thereafter plaintiffs continued to press their claims for accounting, alleging by bill of particulars and amendment and supplement to their complaint, that they were entitled to recover for the conversion of the equipment, permits, licenses, loss of use of equipment, trade name, good will, etc., of Checker. Plaintiffs contended that they were engaged in a joint enterprise with Checker; however, when it was developed by the evidence that Checker had sustained an operating loss of $15,000.00 during the period in question, the matter of joint venture was further urged, if at all, with abated vigor.

Yellow filed its answer and admitted that it had a contract to purchase and intended to buy Checker's assets, including the items claimed by plaintiffs.

Checker answered and alleged that it was the owner of the items in question and that it had agreed to sell and had sold the same to Yellow. It denied that it had been engaged in any joint venture with plaintiffs. Purchaser answered and admitted that it had acquired through Yellow the assets in question. Johnson answered and set forth that he had properly administered and accounted for all monies paid to "Drivers' Crash Fund" and "Drivers' Radio Fund."

The court appointed John J. Morrissey, Esq., as master to determine all issues of fact and questions of law and to report such determination to the court.

Taking of testimony required thirteen days, embracing nearly 3000 folios. The report of the master contains 43 folios. The master found the facts adversely to plaintiffs' contentions, except as to an item of $1834.71, and recommended that judgment be entered in favor of the plaintiffs and against Checker for $1834.71, payable out of the $7000.00 paid into the registry of the court, and

that all other claims of plaintiffs be dismissed. Plaintiffs and Checker filed objections to the report of the master, which objections were heard and overruled and judgment entered in conformity with the master's recommendations.

Plaintiffs are here by writ of error, seeking review and reversal, "with instructions to award plaintiffs judgment for the full measure of damages which they have sustained."

The record contains testimony to the effect that prior to 1941, Checker operated its business with cabs owned by it. In that year it changed its system of operation from company-owned cabs to what is known as the "owner-operator" or "pay-off" system. Each cab was operated each day in two twelve-hour shifts. The driver on each shift paid to Checker the sum of $4.00, plus the cost of gas and oil consumed during the shift; he also paid a contribution to what was known as the "Crash Fund," from which fund damages to the owners' cars caused by accidents and not covered by deductible insurance policies carried by the company were paid.

One of the two $4.00 payments made each twenty-four hours was turned over to the car owners; the other $4.00 payment was retained by Checker. In return for these payments retained by Checker it furnished services which included taxicab stands, licenses and permits, advertising, garage facilities, telephone switchboard service, insurance and bookkeeping service.

In July 1947, the car owners and drivers, in order to meet competition and hoping to enhance their earnings, determined to install two-way radio equipment in the taxicabs operated by Checker under the above plan. Checker refused to assume any financial responsibility for either the purchase price, installation or cost of maintaining or operating such equipment.

The drivers and car owners, in order to carry out this program, formed a voluntary association which they denominated the "Checker Drivers' Radio Fund." A

committee consisting of three members was elected by the members of the association to govern its activities. The fund was: "for the purpose of purchasing, acquiring, financing, retaining the title to and disposing of two-way radio equipment to be installed in taxicabs now and hereafter operated in the name of Checker Cab Company."

The document forming the association provided that any such equipment should at all times be and remain the property of the Checker Drivers' Radio Fund and should not become the property of any member, car owner or driver of the association. On formation of this association and election of the committee, the committee took over the operation of the so-called Crash Fund. Subsequent to July 15, 1947, the administration of the Crash Fund and the Radio Fund was in the hands of this committee, and the company had no control over either fund; Johnson, a member of the committee, actively managed both funds. The car owners and drivers agreed among themselves as to the amount of the contribution that would be made for each shift to each of those funds and the committee purchased radio equipment which was installed in November 1947.

Checker, in furtherance of the efforts of the drivers and owners to acquire two-way radio service, applied to the Federal Communications Commission for a permit in its name authorizing two-way radio service in connection with the operation of its taxicabs, which application was granted. On October 25, 1947, the Radio Fund entered into a written agreement with Checker, which, in part, provided that Checker was recognized as the owner of this permit and the association should not acquire any interest in or to the same. However, Checker agreed to allow the association full use of the permit, the association agreeing to lease the car radio equipment to drivers and owner-drivers. It was agreed that Checker should employ the necessary personnel for the efficient operation of the equipment and the association would

reimburse Checker for salaries of any persons so employed. Thereafter, when a cab was placed in service the owner was required to sign a written agreement to the effect that he acknowledged that all two-way radio equipment was the sole property of the Radio Fund. Funds for the purchase of the radio equipment were obtained through a bank loan. Monies in the Radio Fund and the Crash Fund were used by the association committee interchangeably for payment of obligations incurred by the committee in connection with the Crash Fund and the Radio Fund. The two funds were finally merged in 1949.

In July 1949, the committee owed obligations in the amount of over $7000.00. The committee was without funds to meet these obligations and made unsuccessful efforts to borrow money for that purpose; whereupon the committee applied to Checker for help and Checker, through its president, agreed to assist in obtaining a loan *on condition* that the radio equipment be transferred outright to Checker. The committee accepted this offer of Checker and conveyed title to all of the radio equipment by bills of sale. A bank loan in the sum of $5000.00 was obtained on a note signed by Checker and its president, the proceeds of which were turned over to the committee and used by it toward the payment of its indebtedness. The loan was repaid from the fund, with the exception of the sum of $626.00, which amount was paid by Checker after the sale of its assets to Yellow.

In December 1950, Checker and Yellow entered into a purchase and sale agreement whereby for $12,000.00 Checker sold to Yellow its physical assets, including the radio equipment, Denver permits and, insofar as it could do so, the FCC permit. On December 15, 1950, the owner-drivers and drivers of Checker executed a written Certificate of Dissolution of the committee and ratification of all acts of the committee. At the time of its dissolution, the committee owed $5199.95 in unpaid bills, which Checker assumed and thereafter paid. Payments into

the two funds continued for the last sixteen days of December; collection was made by Checker, which paid the expense of the two funds for said period, including salaries of radio operators and dispatchers and other operating expenses theretofore paid by the committee. Between December 15, 1950, and January 2, 1951, the date the sale to Yellow was completed, Checker received from these payments the sum of $1674.85. The record does not disclose the amounts paid out by Checker during this period; though based on past operating expenditures the amount paid out may well have exceeded the amount received.

Plaintiffs urge six grounds for reversal of the judgment, each of which is predicated on an alleged erroneous finding of fact by the referee.

■ First: It is urged that the FCC permit issued to Checker was in fact the property of the Radio Fund. Counsel in support of this contention points out that Checker had by formal contract with the association (Radio Fund) agreed that:

"The company agrees to allow the association [Radio Fund] full use of the radio permit as long as the permit is in existence * * *."

Such statement falls far short of proving ownership of the permit by the Radio Fund. It would seem that Checker, being in a position to allow the Radio Fund to use the permit, must have had some rights to the permit. Counsel neglect to point out in their brief that this same formal agreement between Checker and the Radio Fund contained an additional provision that:

"Checker Cab Company is recognized as the owner of the permit issued by the Federal Communications Commission authorizing two-way radio service in taxicabs operated for it, and the association shall not acquire any interest in or to said permit."

The master having before him the permit issued in the name of Checker, the formal agreement above referred to and the testimony of witnesses representing

Checker and the Radio Fund to the effect that Checker owned the permit, was on firm ground in holding that the plaintiffs at the time of the proposed sale had no interest in the FCC permit.

■ Second: It is contended that the master erred in refusing to consider the value of the radio system as an operating unit in determining the amount of plaintiffs' damage. The answer to the previous question is an answer to this one. Plaintiffs never owned the permit which was a necessary prerequisite to a radio system as an operating unit; hence, the value of the system was immaterial and evidence offered with reference thereto was properly rejected.

■ Third: It is urged that:

"The taking of the Radio Funds property and FCC license by Checker and Yellow constituted a wrongful conversion."

The committee, selected by the members of the Association of Operator-Owners, executed and delivered to Checker a bill of sale for the equipment and this in return for Checker paying debts of the fund. The evidence not only supports the master's finding, but any finding to the contrary would fail as being contrary to the evidence.

Fourth: It is claimed that Checker and Yellow are jointly and severally liable with the other defendants for conversion of the property of the Radio Fund. This is only a rehash of matters going before. There was no conversion, so there is no need to discuss whether it was joint or several or who may have been answerable for an event that never took place.

Fifth: It is urged that plaintiffs are entitled to an accounting of the monies diverted by Dundon (president of Checker) and Johnson. There was an accounting; much of the 3000 folios of testimony and the exhibits, including books of Checker, deal with the monies of the Crash Fund and the Radio Fund. The funds collected were all accounted for and the master expressly found

that the committee in making the expenditures was:

" * * * fully justified in paying any bills of the owner-operators out of either fund."

Sixth: It is next urged that the master erred in deducting the indebtedness of the *company's Crash Fund* from the amount due plaintiffs.

Just why counsel refer to the Crash Fund as that of the company is difficult to understand, since the record conclusively shows that in 1947, when the association was formed and the committee selected to conduct its affairs, at the insistence of the operator-owners acting through the association and committee, the management and control of the Crash Fund was taken over by the committee and Checker turned over to the committee the balance in the Crash Fund and had nothing further to do with it until the Crash and Radio Funds were unable to meet their obligations and Checker came to the rescue, paid their bills and received their assets in return.

All of counsels' grounds for reversal are predicated on the contention that the master made findings contrary to and unsupported by the evidence. Fragments of contracts and morsels of evidence are presented in the briefs to substantiate their contention. However, a careful examination and consideration of the full context of documentary evidence and of all testimony leads us to conclude that the findings and conclusions of the master, and the judgment of the trial court predicated thereon, are correct and should be and are affirmed.

█ It appears from the record that Yellow has deposited in the registry of the court the sum of $7000.00, being a portion of the purchase price to be paid by Yellow to Checker for the property purchased and sold. The judgment of the trial court is incomplete in that it makes no disposition of this fund and makes no award of costs. The trial court is directed to enter an order directing the clerk of the court to dispose of said $7000.00 in the following manner:

1. To pay to plaintiffs $1834.71, together with interest thereon at 6% per annum, from March 21, 1956, to date paid.

2. To pay to the master such sum as the court may determine is reasonable compensation for services rendered herein.

3. To pay to the reporter for taking and transcribing the testimony such reasonable sum as is provided by law for such services.

4. To pay any balance remaining to Checker.

MR. JUSTICE DAY and MR. JUSTICE FRANTZ not participating.